Frank CAMERO

v.

The UNITED STATES.

No. 192–61.

United States Court of Claims.
May 14, 1965.

Davis, J., dissented.

Edwin J. McDermott, Philadelphia, Pa., for plaintiff.

Thomas J. Lydon, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COLLINS, Judge.

Plaintiff, a non-veteran, is a former classified civil service employee of the Department of the Army. Effective May 29, 1959, plaintiff was removed from his position of supervisory inspector, GS-9, at the Military Clothing and Textile Supply Agency, Philadelphia Quartermaster Depot. In this action, plaintiff seeks to recover back salary from the date of his allegedly wrongful removal. Both plaintiff and defendant have filed motions for summary judgment.

With regard to plaintiff's motion for summary judgment, the basic assertion by plaintiff is that his separation was arbitrary, capricious, and not supported by substantial evidence. Plaintiff attacks (1) the grounds upon which his dismissal was based, and (2) the role which the attorney who represented the Government before the Grievance Committee played in the making of the decision to remove plaintiff. This court has determined *infra* (1) that there were sufficient grounds to warrant the removal of plaintiff, but (2) that plaintiff has raised a serious question as to the possible violation of Army grievance procedures.

Facts pertinent to both motions for summary judgment are as follows: Plaintiff received notice, by a letter dated April 21, 1959, that his removal was proposed. The first charge against plaintiff was that, in 1948, he had accepted from a Government contractor payments intended to influence plaintiff's performance of his official duties. Secondly, the letter stated that, in 1958, plaintiff had falsely certified travel vouchers and, as a result, had received overpayments. Finally, plaintiff was charged with undue familiarity with Government contractors in that, during 1957 and 1958, plaintiff had made three telephone calls from his home to certain individuals whose firms dealt with the Supply Agency.

By letter of May 11, 1959, plaintiff replied to the charges. However, on May 29, 1959, plaintiff was notified that the decision had been made to effect his removal, as of that date. Plaintiff was informed (1) of his right to seek review under the Army grievance procedures and (2) of his right to appeal (regarding procedural violations) to the Third Region of the Civil Service Commission. Plaintiff elected to follow the first course.

Pursuant to the Army regulations, a hearing was held before the Grievance Committee of the Quartermaster Depot. On November 2, 1959, the Grievance Committee submitted its report which included the recommendation that plaintiff be reinstated. With regard to the charge of bribery, the committee determined that the Government had not met its burden of proof. The Grievance Committee did find that plaintiff had violated the instructions of the Supply Agency's Inspection Handbook pertaining to the recording of travel time and mileage, although plaintiff was not guilty of deliberate falsification. Also, contrary to regulations, plaintiff had been unduly familiar with Government contractors. Still, it was the opinion of the Grievance Committee that the proper sanction regarding the latter two violations would be 10 days' suspension, not dismissal.

The report of the Grievance Committee was submitted to the depot commander, Major General Webster Anderson, who reached the conclusion that the charges against plaintiff were sustained. Accordingly, the removal of plaintiff was upheld. Subsequent appeals of plaintiff to the Quartermaster General and to the Secretary of the Army were unsuccessful.

After the approval by the Secretary of the Army of plaintiff's dismissal, plaintiff, on February 8, 1961, initiated an appeal to the Third Region of the Civil Service Commission. Because plaintiff's appeal was untimely (i. e., not filed within 10 days of the removal), the Third Region did not accept the application. The decision of the Third Region was affirmed by the Civil Service Commission Board of Appeals and Review.

Then, on May 12, 1961, plaintiff commenced the present action. On November 6, 1962, plaintiff brought an action in the United States District Court for the Eastern District of Pennsylvania, in which he sought reinstatement and a declaratory judgment that his discharge was wrongful.[1] On September 25, 1963, the district court granted the Government's motion for a general continuance, since plaintiff already had pending the instant suit in this court. Camero v. McNamara, 222 F.Supp. 742, 745 (E.D. Pa.1963).

[1] In the case at bar, defendant had included as one ground for its motion for summary judgment the assertion that, by virtue of 28 U.S.C. § 1500,[2] the filing of the district court suit took away the jurisdiction of this court. At the time of oral argument of the present case, defendant announced that it had abandoned its position on jurisdiction. Furthermore, for the reasons expressed in Tecon Engineers, Inc. v. United States, Ct.Cl., 343 F.2d 943 (April 16, 1965), we hold that, regardless of the degree of similarity between the suit in the district court and the case at bar, the filing of the action in the district court did not affect the jurisdiction of this court over the present case.

Turning to plaintiff's motion for summary judgment, the three grounds for the dismissal of plaintiff can best be considered separately. First, plaintiff asserts that the charge of bribery was not supported by substantial evidence.

The test of "substantial evidence" is widely used as the standard for judicial review of administrative determinations. The Supreme Court has construed "substantial evidence" to be " * * * more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. of New York v. N. L. R. B., 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). The Court added (at 230, at 217 of 59 S.Ct.), "Mere uncorroborated hearsay or rumor does not constitute substantial evidence." These general notions expressed by the Supreme Court, even though stated in a very different context, should be relevant to the present case.

Thus, our task is to analyze the evidence presented before the Grievance Committee and to determine whether it might be accepted by a reasonable mind as "adequate to support [the] conclusion [that plaintiff accepted bribes]." The function of the Grievance Committee was to advise the installation commander. It is also important to note that the Army regulations relative to grievance hearings expressly provided that, *"Legal rules of evidence used in courts of law will not be observed."* [3]

The exact charge against plaintiff was that, in 1948, he accepted payments from

1. Prior to the passage of the act of October 5, 1962, 28 U.S.C. § 1361, such mandamus actions against Federal officers could be brought only in the United States District Court for the District of Columbia. That act extended such jurisdiction to all district courts.

2. The statute in question, 28 U.S.C. § 1500, provides as follows:
   "The Court of Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States. June 25, 1948, c. 646, 62 Stat. 942."

3. Department of the Army, Civilian Personnel Regulations E2, § 5–1.b. (March 1956).

one Jack Altman, the president of Pembroke Clothes, Inc., when plaintiff was assigned as an inspector to the plant of Pembroke.[4] The purpose of the payments was to insure the release of shipments of coats manufactured by Pembroke for the Government. As indicated, the depot commander sustained the charge of bribery, although the Grievance Committee had concluded that the Government had not met its burden of proof.

One item which General Anderson stressed in his decisional letter of December 30, 1959, was the statement given by Altman on January 21, 1953, to an FBI agent. In the statement, Altman admitted a practice of making payments to Quartermaster inspectors in order to secure the release of shipments to the Government. Plaintiff's argument that Altman's statement was not applicable to him is untenable.[5]

It is clear that plaintiff was one of the inspectors implicated by Altman's statement.[6] The depot commander reasonably took the position that Altman's con-

fession was corroborated by the testimony of Fred C. Millman, the former bookkeeper and office manager of Pembroke Clothes. There are definite and obvious inconsistencies between (1) Millman's statements to the FBI on May 28, 1953, and February 2, 1959, and (2) his May 11, 1959, statement to the attorney of plaintiff and his testimony of August 13, 1959, before the Grievance Committee. Contrary to his statements to the FBI, Millman's testimony and his statement to plaintiff's attorney, in part, constituted disclaimers of personal knowledge of payments by Altman to plaintiff. However, it is significant that the depot commander construed the conflicting statements of Millman in a manner favorable to the position of plaintiff. That is, the depot commander accepted the view that, " * * * Mr. Millman had no personal knowledge or eye witness observations of these criminal acts [the alleged bribery], * * *."

■ Considering all the relevant evidence and the circumstances set forth in the record, this court is of the opin-

4. The long delay between the occurrence of the alleged bribery and the notice to plaintiff of his proposed removal was partially attributable to the fact that it was not until December 11, 1958, that the pertinent FBI reports were released for use in administrative action.

5. Plaintiff's brief (filed on May 28, 1964) contains in the appendix what purports to be a reproduction of the substance of the Altman statement. However, the version included in plaintiff's brief contains an error and plaintiff's argument is based, in part, upon that misstatement. Plaintiff's version has Altman stating that the payments were made to Quartermaster inspectors on "prime" contracts. Then, plaintiff asserts that, since he was at the Pembroke plant only in connection with a subcontract, the conclusion follows that plaintiff could not have been one of the inspectors referred to in Altman's statement. Plaintiff's argument is fallacious.

In fact, Altman said that he paid inspectors on "prior" contracts (*i. e.*, prior to January 1950). Thus, it is not correct that plaintiff, whose assignment at the plant occurred in 1948, was exclud-

ed from the statement of Altman, by virtue of the fact that plaintiff was at the plant in relation to a subcontract.

6. In his statement of January 21, 1953, Altman specified three of the inspectors to whom he had made payments. After stating that he did not recall the last names of the inspectors, Altman referred to the three as " 'Nicky,' 'Rocky,' and 'Frank Camerotto.' " There can be no reasonable doubt that in saying "Frank Camerotto" Altman was referring to "Frank Camero." First, on May 28, 1953, Fred C. Millman, who was the office manager of Pembroke in 1948, gave a statement to the FBI in which Millman said that Government inspectors assigned to Pembroke were paid by Altman. Then, Millman continued, "I recall three inspectors specifically and they are, Frank Camero, Nick Travascio, Rocky Santorino." Subsequently, Millman made statements inconsistent in several respects with that of May 28, 1953. However, the fact remains that the portion just quoted coincides with and clarifies Altman's identification of inspectors. Secondly, it was established that plaintiff was present at the Pembroke plant during the period referred to by Altman.

ion that the depot commander was justified in using the charge of acceptance of unlawful payments as one basis for the dismissal of plaintiff.[7]

This court is not unmindful of the serious nature of the charge of accepting bribes, nor do we overlook the drastic consequences of being removed from employment on such grounds. Nonetheless and despite the fact that plaintiff was charged with activities which (if timely asserted) could have provided the basis for a criminal prosecution, the standard of review applicable to the instant case is that of "substantial evidence." It is clear that the charge of bribery was not proved "beyond a reasonable doubt." However, this is not determinative of the case at bar. Cf. Finn v. United States, 152 Ct.Cl. 1 (1961), where the removal of an employee was upheld, despite a directed verdict of acquittal in a related criminal action. Even though the Government did not prove "beyond a reasonable doubt" that Camero had accepted payments from Altman, this court does find that there was sufficient evidence of the alleged bribery to support the administrative decision.

Considering next the charge of "undue familiarity," there is no longer any dispute as to the underlying facts. The Government established that, on December 22, 1957, plaintiff called from his home Mr. Herman D. Oritsky, the president of Herman D. Oritsky & Company, and, on March 15 and August 5, 1958, respectively, plaintiff called Mr. John Machise, the president of Newell Clothing Company. Each of the firms had done manufacturing for the Philadelphia Quartermaster Depot. Although at the times of the respective calls, plaintiff was not assigned to the plant of the person called, there was the possibility that, in the future, plaintiff could have been given an assignment at either of the companies. Previously, plaintiff had acted as an inspector at the Oritsky plant.

The Government did not assert that the calls related to official business and there is no evidence that such was the case.[8] The letter of April 21, 1959, which informed plaintiff that his removal was proposed stated, in pertinent part, as follows:

"* * * In derogation of AR 600–205 and * * * [p. 007.1 of the Supply Agency Inspection Handbook], you have engaged in conduct which tends to interfere with the full and proper discharge of your duties by engendering an undue familiarity with Government contractors, thus, placing yourself in relations which excite conflict between self-interest and integrity. Furthermore, such relationships might reasonably tend to influence your strict impartiality which must prevail in all your Government business relations."

---

7. Great reliance was placed by the depot commander upon the confession by Altman. This court is in agreement with the view of the depot commander that the probative value of the Altman statement is high because, in making it, Altman was subjecting himself to the possibility of criminal prosecution.

It should be noted that the Government attempted, albeit unsuccessfully, to obtain the presence of Altman at the Grievance Committee hearing. For a variety of reasons, this case is distinguishable from Williams v. Zuckert, cert. dismissed, 371 U.S. 531, 83 S.Ct. 403, 9 L.Ed.2d 486, dismissal of cert. vacated, 372 U.S. 765, 83 S.Ct. 1102, 10 L.Ed. 2d 136 (1963).

Finally, according to Jack Nagurka, a Government employee who telephoned Altman on January 13, 1959, Altman said, inter alia, that he did not believe that his January 21, 1953, statement to the FBI was exaggerated.

8. Plaintiff testified that he did not recall the subject matter of the telephone calls, but he did deny that they related to Government affairs. The testimony of plaintiff and an affidavit of Machise indicate that, upon a number of occasions, the two had encountered each other at race tracks. Machise states, in his affidavit, that he owned racing horses and that plaintiff might have called him regarding one of the horses which was scheduled for a certain race.

The depot commander determined that the charge was sustained.[9]

■ This court does not accept the assertion of plaintiff that reliance by the Government upon the charge of "undue familiarity" was arbitrary and capricious.[10] Considering the nature of the responsibilities of a supervisory inspector and the requirement for strict and careful compliance on his part with agency rules and regulations and considering the possible difficulties which plaintiff's conduct might have caused with respect to future assignments, it cannot be said that the Government acted arbitrarily or capriciously.

In determining the sanction to be applied, the depot commander was not bound to follow the recommendation of the Grievance Committee. Despite plaintiff's assertion to the contrary, this court does not find that the reasoning of Cuiffo v. United States, 137 F.Supp. 944, 131 Ct.Cl. 60 (1955), is applicable to the present case.[11] First, the charge that Camero was "unduly familiar" with Government contractors is more serious than the charge which had been made against Cuiffo (i. e., taking for his own use lumber apparently abandoned by the Government). Camero had placed himself in an awkward position that could well have interfered with his effectiveness. Secondly, the matter of "undue familiarity" was only one of the grounds upon which the removal of Camero was

based. For the reasons indicated, this court rejects plaintiff's contention that reliance by the Government upon the ground of "undue familiarity" was arbitrary and capricious.

■ The third charge made against plaintiff related to the falsification of travel vouchers. The Government asserted that, upon a number of occasions in 1958, plaintiff's vouchers contained erroneous information as to travel time and mileage; and, as a result, plaintiff received payments for mileage and for per diem to which he was not entitled. Also, plaintiff was charged with having executed, on March 17 and on March 31, 1959, false affidavits pertaining to the travel time and distance.

Plaintiff's basic arguments are that there was no evidence of deliberate falsification and that separation was punishment "out of all proportion to the offense." The latter contention overlooks the fact that the matter of false certification was not the *sole* ground for the removal of plaintiff.

The Government did make at the Grievance hearing a sufficient showing that mileages and times contained in plaintiff's vouchers were incorrect. Further, the Grievance Committee found that plaintiff had violated the requirements of the Inspection Handbook that exact mileage and travel time (as opposed to estimates) be recorded. However, the committee concluded that plaintiff's viola-

9. With regard to the matter of "undue familiarity," the Grievance Committee had concluded (1) that the telephone calls were "technically in violation of AR 600–205," but (2) that the Inspection Handbook did not specifically cover such circumstances.

10. In support of his assertion, plaintiff cites Greenway v. United States, 163 Ct. Cl. 72 (1963), where the Government's motion for summary judgment was denied, since the plaintiff was entitled to a trial to determine if his removal was due to the personal grudge of a superior. Also cited was Clark v. United States, 162 Ct.Cl. 477 (1963), where judgment was entered for the plaintiff on the ground that his removal represented an abuse of discretion. The facts of the

cited cases differ materially from the case at bar, and neither of the cited cases is persuasive authority for plaintiff's assertion.

11. The plaintiff in Cuiffo was a Government employee who was discharged for cause; he appealed through the agency grievance channels and succeeded in obtaining the reversal of his discharge. Then, Cuiffo brought his action in this court to obtain his salary for the period (320 days) between his removal and his reinstatement. This court held (p. 70) that the punishment imposed, i. e., deprivation of pay for 320 days, was excessive, and that the period without pay should be limited to 30 days. Accordingly, judgment was entered for 290 days' salary.

tions of the regulations could not be considered as deliberate falsifications. The depot commander did not accept the committee's ultimate conclusion or its recommendation that the proper sanction regarding the travel vouchers would be 5 days' suspension. In the opinion of this court, the record does indicate substantial evidence in support of the determination that the falsifications by plaintiff were intentional.

The fact that the amount of overpayment resulting from the erroneous vouchers was small does not mean that the Government acted arbitrarily. It is not for this court to say that the Government was bound to overlook plaintiff's conduct in submitting the inaccurate vouchers.

To summarize, the depot commander determined, on the basis of the three stated charges, that the separation of plaintiff would be in the best interests of the Government, and this decision was affirmed by the Quartermaster General and by the Secretary of the Army. In a real sense, plaintiff is asking the court to substitute its judgment for that of the employing agency and this we decline to do. Cf. Powers v. United States, Ct. Cl. No. 43–63 (March 12, 1965), slip op., p. 5, and cases cited. Based upon our review of the administrative record, this court has found that the dismissal of plaintiff was based upon substantial evidence, and that none of the grounds could be considered arbitrary or capricious. However, this determination is not conclusive of the case. Even though this court will not, insofar as the sufficiency of the grounds is concerned, interfere with the discretion of the employing agency, we must still consider the additional argument of plaintiff that his dismissal was invalidated because of certain alleged activities on the part of Mr. Theodore Kostos, the attorney who represented the Government before the Grievance Committee.

First, plaintiff calls attention to a legal opinion which Mr. Donnell K. Wolverton, the general counsel of the Supply Center, sent to the depot commander subsequent to the hearing. On May 8, 1964, in a letter to plaintiff's counsel in the instant case, Mr. Wolverton stated his belief that " * * * the opinion was either prepared by Mr. Kostos or that Mr. Kostos participated in its preparation." Secondly, plaintiff asserts that Kostos played a part in the actual decision to sustain the removal of plaintiff. The basis for this latter assertion is the statement of Mr. Wolverton (in an affidavit dated June 3, 1963) that:

" * * * Said letter [i. e., the depot commander's letter of December 30, 1959, sustaining the dismissal of plaintiff] was coordinated with Theodore Kostos, Esquire (attorney in my office and under my direct supervision); Mr. James D'Angelillio and Mr. Pat T. McNamara of the Industrial Relations Office; Colonel Ivan Dyekman, Deputy Commander; and Captain James Murphy, Administrative Officer to General Anderson."

Also, a copy of the December 30, 1959, letter retained by the Supply Center was initialed by Kostos and the four other persons named in Wolverton's affidavit. In support of his contention that his dismissal was made arbitrary and capricious because of the roles played by Kostos, plaintiff cites Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950)[12] and Paterson v. United States, 319 F.2d 882, 162 Ct.Cl. 675 (1963).[13]

---

12. Wong Yang Sung v. McGrath, supra, involved the validity of a deportation proceeding. The Supreme Court held (p. 53, 70 S.Ct. 445) that the proceeding was contrary to the Administrative Procedure Act of June 11, 1946, 60 Stat. 237, 5 U.S.C. §§ 1001–1011, because the same person (1) presented the case of the Government at the hearing and (2) prepared a summary of the evidence and a proposed order for the Commissioner of Immigration. According to the Court, the Administrative Procedure Act was intended to ameliorate the evils of combining the investigating and prosecuting functions and the adjudicating function.

13. In Paterson v. United States, supra, this court held that the removal of a Government employee was defective in

The factual situation of the instant case differs materially from those of Wong Yang Sung and Paterson, and neither the Administrative Procedure Act nor the Veterans' Preference Act was applicable to the removal of plaintiff. Still, plaintiff's motion raises serious questions as to whether his dismissal was in compliance with the regulations governing Army grievance proceedings. Clearly, the Army was bound to comply with its own regulations. Cf. Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). Also, cf. Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

In considering plaintiff's assertions, it is imperative to keep in mind the purpose of the grievance committees. The pertinent regulation (Army Civilian Personnel Regulations E2, § 3–1 (March 1956)), after stating that the resolution of employee grievances is a responsibility of the installation commander, goes on to provide as follows:

"* * * However, to relieve commanders of the burden of hearing all grievances personally, grievance committees will be established at the installation level to make findings of fact, hear and evaluate evidence, and make recommendations to the commander as to appropriate disposition of individual cases. *Grievance committee determinations are advisory, constituting privileged staff guidance to the commander.*"

Since the role of the grievance committees is advisory in nature, it would be improper for this court to rule that, with regard to the removal of plaintiff, the depot commander was precluded from seeking the advice of his general counsel.

On the other hand, the regulations required that the actual decision be made by the installation commander. Plaintiff was entitled to the protection of the grievance procedures,[14] and certain standards of fairness must obtain. It is interesting to note the following provision of Army Civilian Personnel Regulations E2, § 3–3 (March 1956):

"* * * *No member* [of a grievance committee] *who participated in the preparation of charges or in the decision to take an adverse action will serve as a member of a quorum considering a grievance arising from the same action.*"

With regard to the removal of plaintiff, there could have been no actual violation of the quoted regulation, but this section does indicate that the grievance procedures envisioned a certain degree of separation of functions.

In the opinion of this court, plaintiff's charges regarding the nature and degree of participation by Mr. Kostos in the decision-making process raise material issues of fact. For instance, to what extent did Kostos take part in the preparation of the general counsel's opinion? What role, if any, did Kostos play in the reaching of the decision embodied in the depot commander's letter of December 30, 1959 (the letter informing plaintiff that his removal was sustained)?

that he was not afforded an opportunity for the type of personal hearing required by § 14 of the Veterans' Preference Act of 1944, 58 Stat. 390, as amended, 5 U.S.C. § 863. The plaintiff's requests that he be granted a personal hearing before his superior were denied. This court stated, 319 F.2d at 884, 162 Ct.Cl. at 679:

"We hold that the right, as provided in section 14 of the Veterans' Preference Act, to answer charges 'personally' is not met by an appearance before investigators charged with the duty to develop the facts to substantiate the charg-

es they, themselves, have drawn up, where the investigators are not supervisors of the employee being charged, nor even superior to him in the chain of command within the agency. * * *"

14. In a general sense, the question of the propriety of the general counsel's letter could be deemed a "procedural matter." However, under the circumstances of this case, there is no basis for asserting that, because plaintiff did not make a timely appeal to the Civil Service Commission, he is precluded from raising this question.

These and related fact questions are material, because, depending upon their resolution, it is conceivable that plaintiff's dismissal was invalidated by the activities of Mr. Kostos. That is, even though there were valid grounds and substantial evidence to support the decision to remove plaintiff, such administrative action could still be overturned if important regulations were violated by the Government. However, these issues cannot be resolved on the basis of the pleadings, affidavits, and other exhibits presently before the court. On the one hand, plaintiff's exhibits do not afford an adequate basis to warrant the granting of summary judgment in his favor, for there has been no sufficient showing as to the extent of the participation by Kostos. See Rule 64(d).

On the other hand, the present record does not justify summary judgment for defendant. The Government has introduced an affidavit of General Anderson, the depot commander, in which he states that the decision " * * * concerning Mr. Camero's dismissal and the dismissal of his grievance were my sole and exclusive decisions, based upon my careful and thorough review of all the evidence, which included the Report of the Grievance Committee and the solicited opinions and advices rendered to me by members of my staff." Nonetheless, in view of the questions raised by plaintiff's motion, this affidavit cannot be regarded as decisive.

In conclusion, both motions for summary judgment are denied. The case is returned to the Trial Commissioner for further proceedings in accord with this opinion. The trial is to be limited to the issues relating to the participation of Mr. Kostos and is not to include the matter of the validity of the grounds for removing plaintiff. As indicated previously, this court has already determined the question of the validity of the grounds for the removal of plaintiff.

DAVIS, Judge (dissenting).

Under the Army's Civilian Personnel Regulations, plaintiff's case was heard by a grievance committee "established at the installation level to make findings of fact, hear and evaluate evidence, and make recommendations to the commander as to appropriate disposition of individual cases." Having thus created a hearing-type remedy for its employees, the Army was bound to follow the fair procedure implicit in that grant, even though a more summary disposition was permitted by the Lloyd LaFollette Act. Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). Inherent in the concept of a decision based on an adversary hearing, especially an evidentiary hearing, is the fundamental premise that one of the adversaries will not make secret, *ex parte*, recommendations to the deciding officer or tribunal. See Sangamon Valley Television Corp. v. United States, 106 U.S. App.D.C. 30, 269 F.2d 221, 224–225 (1959), 111 U.S.App.D.C. 113, 294 F.2d 742 (1961); Massachusetts Bay Telecasters, Inc. v. Federal Communications Commission, 104 U.S.App.D.C. 226, 261 F.2d 55, 66 (1958). In an adversary proceeding there can hardly be a graver incursion upon fairness than to permit trial counsel for one of the parties to communicate his arguments privately to the decider. A persistent theme of modern administrative law is the separation, in an adversary proceeding, of the deciding tribunal from the *ex parte* views of the attorneys who are the Government's advocates in the particular case. See Section 5(c) of the Administrative Procedure Act, 60 Stat. 239, 240, 5 U.S.C. § 1004(c); Section 4(a) of the National Labor Relations Act, as amended, 61 Stat. 139, 29 U.S.C. § 154(a); Section 5(d) (8) of the Communications Act of 1934, as amended, 75 Stat. 421, 47 U.S.C. § 155(d) (8). The Army's regulations must be taken to incorporate this basic standard of fair practice.[1]

1. As the court points out, the regulation specifically embodied a comparable standard when it prohibited an individual who had participated in the preparation of the

I am satisfied from the materials before us on these motions for summary judgment that this principle was squarely violated in plaintiff's case. Counsel for the employing agency before the grievance committee was Mr. Kostos, a member of the office of the general counsel of the agency. He appeared and tried the case for management. After completion of the grievance hearing, the general counsel (Mr. Wolverton) signed a detailed legal memorandum to General Anderson, the executive director of the agency and commander of the quartermaster depot, recommending denial of the grievance, "notwithstanding the recommendation of the Agency's Grievance Committee." Mr. Wolverton wrote to plaintiff's present counsel on May 8, 1964, that this "legal opinion" "was either prepared by Mr. Kostos or that Mr. Kostos participated in its preparation." On the office copy of General Anderson's decision (of December 30, 1959) rejecting plaintiff's grievance appear the handwritten initials of Mr. Kostos (and of others). Mr. Wolverton has signed an affidavit that the general's letter "was coordinated" with Mr. Kostos (among others). That letter-of-decision reads closely upon the legal memorandum submitted by the general counsel. From all this I think it clearly inferable that Mr. Kostos participated in a significant fashion in the ultimate process of decision by the depot commander. He made recommendations to the general and he had a hand in the writing of the general's decision. The defendant does not deny those facts, and there is no need for a trial to establish them.

Participation of this type by adversary counsel vitiates the decision to remove plaintiff. No doubt General Anderson made up his own mind, but he made it up on the basis, at least in part, of *ex parte* views and communications from a lawyer with an adversary stake in the outcome

charges or the decision to take action against the employee from sitting on a grievance committee considering a grievance arising from the same action.

and whose position had been rejected by the hearing board. That is enough of a taint. Of course, the commander had a right to private briefing and assistance from lawyers, but he should have been insulated from the one lawyer who tried the case for management. There were others who could properly have been asked for help, but due process forbade that role from being assigned to the same interested attorney who had been the Government's advocate at the hearing. Especially was this so in a case in which that lawyer had failed to convince the three committee members who presided at the hearing and whose recommendation he was asking the commander to reverse.[2]

Even if I were fully prepared to join in the court's finding that the charges against plaintiff were all adequately sustained, this major departure from fair procedure would move me to vote to invalidate his dismissal and for judgment in his favor. As Mr. Justice Brandeis said, and Mr. Justice Frankfurter often repeated, "in the development of our liberty insistence upon procedural regularity has been a large factor." Burdeau v. McDowell, 256 U.S. 465, 477, 41 S.Ct. 574, 576, 65 L.Ed. 1048, 13 A.L.R. 1159 (1921) (Brandeis J., dissenting); Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 164, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). The ultimate merits of plaintiff's dismissal cannot hide the deprivation of fair procedure he urges upon us. Cf. Garrott v. United States, Ct.Cl., 340 F.2d 615, 621–622, decided Jan. 22, 1965.

I am not ready, however, to join in the court's discussion of the merits of the removal. It is a close question whether there was sufficient substantial evidence to sustain the bribery charge, and I do not, because I need not, reach that difficult issue. I think that the other two

2. There is no suggestion of conscious bias on the part of Mr. Kostos, or that he did not do his best to be fair, but all lawyers know the unconscious and subconscious influence of the advocate's zeal.

charges, the minor counts, were not sustained. In upholding the allegation of "undue familiarity" on the basis of three widely-separated non-business telephone calls, the court is binding a quartermaster inspector to an absolute standard of non-fraternization which has not been applied to courts, other tribunals, or high executive or administrative officers. The record shows, in my opinion, that this charge is trivial. The evidence also fails to support, with respect to the count relating to falsification of travel vouchers, the administrative finding that plaintiff deliberately falsified. In any event, the *ex parte* participation by the Government attorney in the administrative decision makes it impossible, in my view, to apply the "substantial evidence" test to this case. That test presupposes that the decision was arrived at by fair process. Cf. St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 73, 56 S.Ct. 720, 80 L.Ed. 1033 (1936) (Brandeis, J., concurring).

Davis and Laramore, JJ., dissented in part.